**LANCASTER et al. v. WOOD.** (No. 3089.)

(Court of Civil Appeals of Texas. Texarkana. Dec. 31, 1925. Rehearing Denied Jan. 21, 1926.)

Railroads ⊕=278(2)—Consignee, using force to open car door causing injury, held guilty of contributory negligence.

Consignee, voluntarily using force to open door of freight car, after discovering that it would not move more than couple of inches without force, assumed risk of injury by fall when door yielded, and was guilty of contributory negligence, precluding recovery from railway company.

Appeal from District Court, Hunt County; George B. Hall, Judge.

Action by Lewis S. Wood against J. L. Lancaster and others, receivers of the Texas & Pacific Railway, and another. From judgment against the receivers, they appeal. Reversed and rendered.

A box car containing a through shipment of fertilizer was conveniently placed by the railway company on the side track by the depot. to be unloaded by the consignee. The consignee and two other persons having an interest in the fertilizer, the appellee being one of the said three persons, proceeded to unload the car. As a consequence of the attempt to open the car door the appellee, as he claims, received personal injuries, for which he. sues. The negligence alleged is that: (1) "There was a defect in some part of the door or the car or the appliances for opening or fastening of the door"; (2) "that the sill of the car upon which the door rested or upon which the door was intended to slide was bound or fastened in a way that took great and unusual strength to move or slide the door"; (3) "failure to give the plaintiff notice of the defective condition of the car and car door"; (4) that there was negligence "in handling said car with unnecessary violence and roughness in transit from Shreveport, La., to destination, so as to cause the sill of the car to bind the door and to make it difficult to open, and in failing properly to inspect said car and door."

The defendants claimed and pleaded that the appellee's injury was occasioned solely by the method adopted by him and those assisting him to open the door; that the appellee discovered and knew that the car door was stuck and hard to open, and negligently placed himself in such position in the car, and against the door, as necessarily to fall when the door yielded to the force being applied by the appellee and others.

The case was submitted to a jury on a general charge, and they returned a verdict in favor of the appellee against the receivers of the Texas & Pacific Railway, but against the appellee in favor of the Texas Midland Railway Company.

It appears that on February 27, 1923, the Virginia-Carolina Chemical Company of Shreveport, La., shipped a carload of fertilizer, put up in sacks of 100 pounds each, from Shreveport to Cash, Texas. The shipment was in a box car routed over the Texas & Pacific Railway and the Texas Midland Railway. The bill of lading was issued by the receivers of the Texas & Pacific Railway, and recited:

"Consigned to order of Virginia-Carolina Chemical Company; destination Cash, state of Texas, county of Hunt; notify F. Hasselfield at Cash, county of Hunt, state of Texas."

Several persons, including appellee and F. Hasselfield, had agreed among themselves to buy a carload of fertilizer, and thereupon F. Hasselfield entered into a contract in his name with the said chemical company for the purchase of the same. When the car arrived at Cash, Tex., on March 6, 1923, it was placed on a side track by the depot for unloading, and F. Hasselfield was notified of that fact. Mr. Hasselfield and the other parties interested paid the freight charges, and they proceeded to unload the car. It appears that, after taking "the seal" from the door of the car, and delivering the same to the railway agent, two of "the parties commenced to undertake to open the door." Appellee was injured in attempting "to open the door," and he thus describes it:

"The car was set out about 100 yards south of the depot at Cash, on the side track. In order to reach the car with our wagons for the purpose of unloading it, we went on the west of it. We opened the west door of the car. Those present engaged in unloading the car were F. Hasselfield, myself, and J. C. Covington. Frank Hasselfield was there. I had 72 sacks of the fertilizer in the car. Several had an interest in the fertilizer in the car besides F. Hasselfield and myself. F. Hasselfield is the man the car was consigned to—Frank Hasselfield. Mr. F. or Frank Hasselfield went to the depot and saw the railway agent, Mr. Henry Vansickle, before we went to where the car was located. Then Mr. Hasselfield and the agent came to where the car was located, and the agent demanded the seal. Some one then twisted the seal off, and threw it towards the agent. The agent did not open the door or make any effort to open it. The parties commenced to undertake to open the door. They first started by prizing the door open with sticks of wood until they got it wide enough open for me to help them—about 18 inches wide. I got up (into the car) and commenced with all the purchase power I could to help them. I put my right shoulder to the door. Freddie Hasselfield in his wagon by the door taken hold of the handle, and J. C. Covington on the ground pushed. After we had pushed the door some distance it all at once gave away, and threw me out of the car, and I fell across the edge of the wagon bed down there. At the

time the door turned loose suddenly I had my back against the sill of the door, and naturally was leaning. When I had my shoulder against it and while I was in a leaning position I was using all the power I had against the door to push it. When the door gave way, shot back, it did so suddenly, and I just went like a bullfrog jumping in a pond and fell across the edge of the wagon' bed."

On cross-examination he said:

"Mr. Freddie Hasselfield drove the first wagon up to the car door. When we started to open the door I never done anything but stand up in the wagon and watch the work until the door was prized open enough for me to help them. Freddie Hasselfield and J. C. Covington prized the door open. Frank Hasselfield got the sticks, some stove wood, for them to prize with. While that was being done I was standing in the wagon right up at the car door. They started in with small sticks, then they got bigger ones, and just kept prizing and pushing until they got it open wide enough for me to get up there (inside the car). When I got inside the car door was open somewhere from 1 foot to 18 inches. After I got up there, and before I fell, we had pushed the door possibly 1 foot. I had my shoulder against the door and my right foot up against the jamb of the door so as to give me a strong push on it. I was pushing to open the door. I don't know what was holding the door."

According to the evidence of the other witnesses the injury happened about as the appellee stated.

Freddie Hasselfield, for the appellee, testified:

"After Mr. Woods (the appellee) was thrown out of the car the question arose as to the cause of the door hanging. Frank Hasselfield took his knife and scraped up rust along the right side of the bottom of the door where the bar of iron runs. The flakes of rust were about as thick as the thumb nail. I noticed that the place where the rollers run was kinder rusted, and the car was tolerably old, as it looked to me. I don't know whether the flaked rust was where the rollers of the door run or not, but it was right along the bottom of the door. I don't recollect about the rollers. I could not see them. * * * There were rollers of iron fastened on the top of the door that rolled and would slip back and forth in a track at the top. When we first started to open the door it opened about a couple of inches all right; then it would not move further without prizing."

It was also shown that rough handling of cars in transportation oftentimes causes the steel sills to cup and make the doors hard to open. There is no evidence showing any defective condition of the door itself.

The appellants proved that at the time the car was set on the track at Shreveport for loading by the chemical company the car, including the doors, was carefully inspected and found to be in good condition.

The court instructed the jury as follows:

"It was the duty of the receivers of the Texas & Pacific Railway at Shreveport, La., before starting the car on the journey, to use ordinary care to examine said car with respect to its condition for transportation, and, if the same was found in such a defective condition respecting the door as to make it reasonably apparent from such inspection that the door, or the appliances connected therewith for its opening, was in such condition that one trying to open the door to remove the fertilizer at the point of destination would or might likely be hurt in trying to open the door, it was then its duty to repair such condition, if defective, before starting said car on its journey."

The court also charged the jury:

"If you find from the evidence that the plaintiff in getting into the partially opened door of the car and pushing against the door the way he did was under the circumstances guilty of negligence on his part, and that such negligence, if any, caused or contributed to his injuries, then, if you so believe, you will find for the defendants."

The appellant specially excepted to the charges, and requested the following charge, which was refused:

"Gentlemen of the jury: The evidence in this case is not sufficient to authorize a verdict against the defendants, and you will therefore return a verdict for said defendants."

R. S. Shapard, of Dallas, and McMahon & Dohoney, of Greenville, for appellants.

B. Q. Evans and H. L. Carpenter, both of Greenville, for appellee.

LEVY, J. (after stating the facts as above). The proposition of appellant in effect presents the point of view that the evidence speaks unequivocally on appellee's negligence, and therefore he should not be allowed to recover for the resulting injury. In determining whether or not a recovery should be allowed, it is essential to view the conduct of the railway company and the appellee as a whole, and note the bearing the acts of each had upon the resultant injury. The facts are practically without dispute. The railway company placed the car at the usual place, which was safe and convenient, for unloading, and notified the consignee of the readiness of the car for unloading. It is conceded that the railway company was not to remove the freight from the car, it being a carload lot. After receiving the notice, the consignees, of which there were several, including the appellee, then took possession and control of the car for the purpose of unloading the same. It was conclusively shown that, after taking "the seal" from the door of the car, and delivering the same to the railway agent, two of the "parties (owners of the freight) commenced to open the door." They succeeded in opening the door, as appears, only "about a couple of inches," when it was discovered that "it would not move further without prizing." The two "parties" and the appellee, who was standing near the door, then voluntarily proceeded to use force to "prize"

the car door open, and as a consequence of the method adopted to force the door open the appellee was injured. The appellee testified, and the other witnesses say the same thing, that—

"the parties commenced to undertake to open the door. They first started by prizing the door open with sticks of wood until they got it wide enough open for me to help them—about 18 inches. I got up (inside the car), and commenced with all the purchase power I could to help them. I put my right shoulder to the door, and Freddie Hasselfield standing in his wagon by the door, taken hold of the handle, and J. C. Covington, standing on the ground, pushed. After we had pushed the door some distance, it all at once gave way (responded to the force used), and I fell across the wagon bed there—threw me out of the car. I had my back against the sill of the door, and naturally was in a leaning position at the time the door turned loose suddenly. When I had my shoulder against the door, and while I was in a leaning position, I was using all the power I had against the door to push it. When the door gave way, shot back from me, it did so suddenly, and I just went (out of the car) like a bullfrog jumping in a pond, and fell down across the edge of the wagon bed."

The door was so constructed as to safely answer the purpose when used for that purpose only. The door was merely stuck or hung up from some cause, rendering it difficult to open. The cause of its being stuck and hard to open is not definitely shown, but inferably, as a jury would be authorized to say, the door would not slide easily on its rollers either because of rust in the carrier iron that the rollers moved in or because the sill of the car was binding the door, making it difficult to open. So, then, from the facts the appellee and the other two owners of the freight knew that the car door would not open easily, and only with difficulty by the use of force; and, so knowing, without protest and voluntarily, nevertheless undertook to force the car door open by methods of their own judgment and by means of their own choosing. If it be for the moment assumed that the railway company was negligent in the premises in reference to allowing the condition of the door to exist, still, as conclusively shown, the appellee and those assisting him knew of the negligence, in that the door would not open except with force, and, so knowing, voluntarily assumed the responsibility of opening the door with force, contributing to his injury. And assuming, too, that the railway company as a carrier owed the duty to the consignees to open the door in order to allow access to the freight in the car, as a necessary and inseparable part of the placing of the car for unloading purposes, it would be the right of the consignees to refuse to accept the proffered delivery and to unload the car until that duty was performed by the company, after they had discovered

that the door would open only with force applied to it. If the consignees had called upon the railway company through the agent to open the car door, the railway company might have provided an employee who knew how to open it with safety. The consignees, however, made no request of the railway company through the agent to have the car door opened. Nor did the consignees, after fully knowing of the difficulty of opening the door and of unloading the car, refuse to accept possession and control of the car. The consignees, including the appellee, voluntarily undertook to do the act of forcing the car door open; and the appellee was injured, as conclusively shown, as a consequence solely of the method and manner adopted. Appellee and those assisting him put the force in motion that caused his fall, and the appellee placed himself in the position to fall. The danger was as obvious to him as to any normal person of his age of the probability of falling, as happened, upon the door's being moved forward; it being pushed, as stated, "with all the purchase power I could, using all the power I had against the door to push it." Knowledge of such physical law would be attributable to him, and the acceptance of the risk would be imputed to him. In such facts the law will not divide the duty between the railway company and the appellee, and the appellee was bound to take precaution to prevent injury being done thereby.

It is concluded that the appellee is not legally entitled to a recovery, and that the judgment should be reversed and judgment here entered in favor of appellant, with all costs of the trial court and of this appeal.